E-FILED
Monday, 17 August, 2020 01:29:34 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **MOBIMEDS, INC., d/b/a THE PILL CLUB,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 19-cv-3224** |
| | ) | |
| **E-MEDRX SOLUTIONS, INC., and DEBBIE DRENNAN,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## O R D E R

Plaintiff, MobiMeds, Inc., d/b/a The Pill Club, filed its Amended Complaint (#13) on November 5, 2019. Before the court is Defendants' Motion to Dismiss (#14), to which Plaintiff filed a Memorandum in Opposition (#18) and Defendants filed a Reply (#20). Defendants' Motion to Dismiss (#14) is GRANTED in part and DENIED in part.

## I. BACKGROUND

The facts, drawn from the Amended Complaint (#13), are accepted as true for purposes of this order. *Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1095 (7th Cir. 2015).

A. The Parties' Businesses and Roles in General

Plaintiff is an independently owned retail pharmacy licensed by the California Board of Pharmacy. Plaintiff, doing business as The Pill Club, dispenses prescription medication.

Defendant E-MedRx is a Pharmacy Services Administration Organization ("PSAO"). Defendant Drennan is the CEO of E-MedRx. As a PSAO, Defendant E-MedRx contracts with independent pharmacies (like Plaintiff) "thereby enrolling these pharmacies as participants in E-MedRx's pharmacy network." Through E-MedRx, these independent pharmacies are then allowed to participate in a variety of pharmacy benefit plans offered by health insurers and oftentimes managed by Pharmacy Benefit Managers ("PBMs").

E-MedRx enters into contracts with various PBMs on behalf of the independent pharmacies in its pharmacy network so that the pharmacies may service individuals whose pharmacy benefits are administered by these PBMs. Many PBMs pay PSAOs directly for the pharmacy services rendered by the PSAO's member pharmacies.

So, here, if everything works as planned, when Plaintiff dispenses medication to a patient who receives her prescription drug coverage through a company that contracts with a PBM to administer that coverage, the PBM remits payment to E-MedRx. E-MedRx then remits the payment to Plaintiff, along with an Explanation of Benefits ("EOB"), so Plaintiff can determine which of Plaintiff's claims E-MedRx has paid.

B. <u>The Dispute</u>

On about April 25, 2018, Plaintiff entered into an Agreement with E-MedRx through which the parties agreed to perform according to certain terms, to carry out the business described in the preceding paragraph. The Agreement is attached to the Amended Complaint. See (#13-1) at 2-6.

As part of the Agreement, E-MedRx agreed to provide Plaintiff with services including but not limited to claim reconciliation and payment, and "handl[ing] all processing issues" Plaintiff encountered related to the pharmaceutical services it rendered.

The Agreement contains six paragraphs, each with a several sub-paragraphs. Paragraph four concerns "TERMS AND TERMINATION." Sub-paragraph b) states:

> This Agreement may be terminated by a party if the other party commits a material breach of this Agreement and if such breach is not cured within sixty (30) [error appears in original] days after written notice of the breach from the non-breaching party. NETWORK [E-MedRx] may terminate this Agreement if PHARMACY [Plaintiff] fails to pay any amount due and such failure is not cured within five (5) days after written notice of such failure is provided.

Plaintiff alleges E-MedRx "systematically failed to perform pursuant to the Agreement with respect to its obligation to provide proper claims reconciliation and remit monies due and owing to Plaintiff for claims submitted and adjudicated with various PBM[s] and other payers." Plaintiff alleges that it has never received full remittances or EOBs for its claims since the inception of the parties' relationship, and

3

that according to the limited data it has currently in its possession, E-MedRx owes it "not less than $2.5 million, and likely more."

Plaintiff first raised the issue of missing EOBs and remittances on about September 17, 2018, by emailing Defendant Drennan. Drennan responded that E-MedRx had "IT issues" and needed an IT technician to access EOBs.

Between September 17 and September 26, 2018, Plaintiff proceeded to make "over twenty more" attempts to acquire EOBs from Defendants, via email and calls. Drennan did not answer Plaintiff's calls, voicemails, or emails.

On September 28, 2018, Drennan responded, stating, "On training call right now, funds and EOBs going out today." No such materials were delivered. Based on this exchange and the fact that no EOBs were produced, Plaintiff concluded Drennan's assertion of "IT issues" was a false statement.

After "several more" attempts to contact Drennan, Drennan responded to Plaintiff on October 1, 2018, with "I will be out of the office 10/1/18 returning 10/9/18. I will have little access to emails. Please contact Jennine … or Tammy … if you need assistance. Any payment or EOB issues please email me and I will get back to you." Plaintiff attempted to contact Jennine and Tammy, who were employees of E-MedRx. Tammy told Plaintiff that Drennan was the only person handling pharmacy business and "they received many upset client calls but they were unable to help." Plaintiff was advised to continue reaching out to Drennan.

On October 3, 2018, Drennan responded to Plaintiff's persistent calls with "I'm so sorry, I'm traveling and when I send funds I have to enter this code and forgot. I will do first thing in morning. So overwhelmed right now that is why I'm trying to get Optum to send these payments to each site." On October 8, 2018, Drennan responded to multiple calls with an email that said, "Payment went out Friday working on EOB's now." On October 9, 2018, Drennan responded to an email from Plaintiff requesting a funds update with, "I'll call Bank first thing in morning." On October 29, 2018, Plaintiff received "partial EOBs" and a "small payment of $212,574.77."

From December 2018 through April 2019 Plaintiff received the following "litany of excuses" from Drennan. December 5, 2018, "We moved and we've had server issues sending funds Friday [.]" December 10, 2018, "Yes I'm so overwhelmed I'll get tomorrow thanks for reminder[.]" December 13, 2018, "It will hit tomorrow Alec and I did send check spam or junk let me I'll send again[.]"

January 8, 2019, "I sent funds u should have tomorrow or wed[.]" January 9, 2019, "Need bank account number to transfer. Need TPC to fill out bank deposit forms[.]"

February 17, 2019, "Alec so sorry for not getting back between my granddaughter and e-Med was a victim of a hack. FBI have been working very hard but they say it's not likely to recoup money. I have not listed you guys yet as the FBI have shut down 3 pharmacies already. They will have to come and go through all your computers and stuff. It's been a nightmare. I'm to the point where the stress is not

worth this! I'll try to call you tomorrow." February 19, 2019, "Meeting FBI today what should I do?" to which Plaintiff responded, "Hi Debbie! I'm not sure what you are asking me about. We didn't do anything wrong and I'm not understanding how your systems being hacked impacts us. I need two items – 1. Payment for last two months and 2. List of payers that still go through you."

Plaintiff, on March 8, 2019, sent E-MedRx a strongly worded letter. That letter says, in part:

> By way of this letter, The Pill Club is providing E-MedRx notice of material breach in accordance with Section 4(b), which provides that the Agreement may be terminated by a party if the other party commits a material breach of this Agreement and if such breach is not cured within thirty days after written notice of the breach from the non-breaching party. By way of this letter, the Pharmacy demands that E-MedRx cure the material breaches of contract, as further identified below, within the next thirty days. **Failure to cure the material breaches to the satisfaction of the Pharmacy within the next thirty calendar days, or by April 7, 2019, shall result in immediate termination, effective April 8, 2019.**

(#13-1) at 9 (emphasis in original).

Page two of the March 8 letter provides, in part:

> Thus, in order to cure the aforementioned material breaches, the Pharmacy hereby demands the following:
>
> (1) E-MedRx shall remit a sum of not less than $500,000 to the Pharmacy on or before April 6, 2019, representing the known, *minimum* unpaid claims processed through E-MedRx (the actual amount is likely much larger).
> (2) E-MedRx shall provide a full and complete accounting of all claims processed by the Pharmacy, monies received on behalf of the Pharmacy, and amounts paid to the Pharmacy. To the extent this accounting reveals additional funds due and owing to the Pharmacy, E-MedRx shall immediately remit payment therefor.

    (3) E-MedRx shall provide proof of financial solvency, subject to approval by the Pharmacy in its sole discretion. This shall include an audited third party financial statement.

    (4) E-MedRx shall permit the Pharmacy full access to E-MedRx's books and records to conduct an audit of E-MedRx's records, in light of the aforementioned breaches. This inspection shall be performed at E-MedRx's expense.

…

Please confirm immediately in writing E-MedRx's agreement to undertake each of these requirements for cure. In the event these material breaches are not cured to the Pharmacy's satisfaction by April 7, 2019, the Pharmacy reserves all rights to take any and all actions and remedies under the Agreement, including but not limited to, termination of the Agreement under Section 4(b).

(#13-1) at 10.

Defendants' excuses continued. On March 9, 2019, "My treatment is all day can we talk tomorrow or Monday[.]" March 11, 2019, "Going outside of hospital to call here in a bit[.]" March 20, 2019, "I'm sorry Alex mom was not good today I'll try you tomorrow and will be sending EOBs and funds Friday[.]" March 26, 2019, "Alex I'm a mess! Just released I had a nervous breakdown can I call you tomorrow?" March 28, 2019, "I'm sorry Alex my mom had a cardiac arrest today back in ICU. You should get a check tomorrow…[.]"

April 4, 2019, "Alex I just looked at my emails what about the attorney it says something by the 7th? Alex please give me some time to get my head on please[.]" April 16, 2019, "In session with my granddaughter I'll call when out[.]" April 24, 2019, "Sending check tomorrow and working on your 835s really hard to concentrate I have an empty feeling[.]"

April 7, 2019, came and went without E-MedRx meeting the four demands in Plaintiff's letter of March 8, 2019. Rather than the $500,000 Plaintiff demanded, E-MedRx submitted two payments "totaling only $275,000."

Drennan also sent multiple emails and other communications to Plaintiff's agents stating that E-MedRx was the victim of a "hack" through which E-MedRx lost funds allegedly belonging to Defendants, that there was an ongoing FBI investigation into the hack, and that Drennan was in contact with an FBI agent named Brian regarding the hack.

Defendants' "litany of excuses" have never been factually supported by Defendants and, "upon information and belief, represent a pattern of fraudulent behavior designed to induce Plaintiff into deferring any action to collect contractual payments or seek new PSAO services."

Plaintiff sent Defendants another strongly worded letter on August 12, 2019, attempting to "resolve this matter short of litigation" and seeking "no less than $2.5 million representing what Plaintiff calculated was the outstanding debt between the parties."

On around August 15, 2019, in response to requests from Plaintiff, Defendant Drennan stated she would produce all outstanding EOBs and proof of payment to Plaintiff for all outstanding claims. Drennan produced some documents, however, "those documents did not substantiate payment of outstanding balances, nor did they establish a complete or even sufficient record of the parties' transaction history."

8

Plaintiff alleges that upon information and belief, "on or about September 15, 2019, E-MedRx terminated Plaintiff's Agreement without notice. Plaintiffs were informed of this termination only second-hand, through the PBMs themselves."

Plaintiff alleges that since it had "no prior knowledge regarding if or when E-MedRx would terminate Plaintiff, Plaintiff was unable to secure a new PSAO in time to avoid interruption of their services; thus, Plaintiff was damaged by being unable to have claims processed and reimbursed, though Plaintiff still filled claims for patients at its own expense." And, "patients may have also been harmed by the interruption in service."

Defendants have not, to date, "been able to establish a full record of the parties' transaction history, nor indeed, any indication that E-MedRx or Drennan ever performed or were ever capable of performing according to the terms" of the Agreement and Defendants' representations.

Plaintiff alleges:

Defendant Drennan's actions and inactions on behalf of E-MedRx, including but not limited to her assertion of personal problems in an attempt to defer the responsibilities of the corporation demonstrate such unity of interest and ownership in E-MedRx that the separate personalities of the corporation and Drennan no longer exist, and that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice upon Plaintiff.

Plaintiff alleges eight counts against Defendants.

Count One is a claim for breach of contract. In addition to the common allegations, Plaintiff alleges it contracted with Defendant E-MedRx according to the terms of the parties' Agreement, that the Agreement governs the rights and obligations of the parties' contractual relationship, that Plaintiff performed in accordance with all material terms of the Agreement, and that notwithstanding Plaintiff's performance E-MedRx:

> [H]as never fully performed pursuant to those terms, that E-MedRx breached the contract by failing to properly process claims and remit payment and EOBs to Plaintiff on a regular basis, and that E-MedRx is further in breach of its duty to collect and transmit payment to Plaintiff, as it is deficient in monies owed to Plaintiff in an amount of at least $2.5 million.

Count Two is another claim for breach of contract. In addition to all preceding allegations, Plaintiff alleges that it contracted with Defendant E-MedRx according to the terms of the Agreement, that the Agreement governs the rights and obligations of the parties' contractual relationship, and that Plaintiff performed in accordance with all material terms of the Agreement.

Count Two quotes the part of the Agreement that governs the parties giving each other notice, and the relevant provisions of the Agreement related to termination of the Agreement. Plaintiff alleges that none of the "above provisions for termination were met or expressed by either party." Further, Plaintiff alleges, "[n]otwithstanding the lack of notice or other indication regarding which provision of the contract it invoked to

justify termination, Defendants terminated Plaintiff abruptly and without notice, whatsoever." Plaintiff alleges Defendants' termination of Plaintiff resulted in Plaintiff filing claims for which Plaintiff was not reimbursed. Thus, Plaintiff alleges, E-MedRx materially breached its obligations under the Agreement, and Plaintiff suffered damages.

Count Three is a claim for fraud. In addition to all the preceding allegations, Plaintiff alleges, "beginning September 17, 2018, … Drennan made profusive excuses regarding Defendants' inability or refusal to meet the terms of the contract." Plaintiff realleges these "profusive excuses," which the court has already recounted, above. Plaintiff alleges "[u]pon information and belief all of these representations were asserted by [D]efendants as part of a pattern of behavior designed to misrepresent the facts in order to induce Plaintiff to defer action to enforce the parties' contract." Plaintiff relied on Defendants' representations and continued to do business with Defendants. If Plaintiff had known Defendants were misrepresenting the facts Plaintiff would have taken immediate action to enforce the parties' contract, collect outstanding amounts due at that time and would have sought a new PSAO. Plaintiff alleges it has been damaged "in the amount of funds Defendants retained for themselves or of which Defendants otherwise deprived Plaintiff."

Count Four is a claim for breach of fiduciary duty. In addition to all preceding allegations, Plaintiff alleges that incorporated into the parties' Agreement was an Addendum A, "Limited Power of Attorney," which gives E-MedRx the power,

> 1. To sign, seal, execute, deliver and/or acknowledge, and to bind the undersigned pursuant to, all contracts, agreements and other documents and instruments (collectively, the "agreements") with pharmacy benefit managers and other third party payers (collectively, "Payers") as are required by the Payer and for such Payer to accept pharmaceutical claims [from] the undersigned, and which Agreements may include an agreement on the part of the undersigned to accept such Payer's reimbursement rate with respect to such pharmaceutical claims; and
> 2. To execute all necessary instruments to carry out and perform any of the powers stated above, and to do any other acts requisite to carrying out such powers.

Plaintiff alleges the Limited Power of Attorney imposed a fiduciary duty upon E-MedRx, which duty it owed to Plaintiff. Plaintiff alleges E-MedRx was required to enter into contracts with PBMs and process payments to Plaintiff, but notwithstanding those requirements, E-MedRx willfully ignored its duties to carry out its powers under the contract and was grossly negligent in its failure to carry out such duties. Plaintiff alleges that it was damaged as a result of E-MedRx's breach.

Count Five is a claim for conversion. In addition to all preceding allegations, Plaintiff alleges E-MedRx's retention of payments destined for Plaintiff was never authorized, approved, or agreed by Plaintiff. Plaintiff demanded Defendants disburse all of Plaintiff's monies to Plaintiff, but Defendants have refused to do so. Plaintiff alleges "Defendants' assumption of control over Plaintiff's payments was unauthorized and wrongful," "Defendants have converted these funds for their own personal

benefit," Plaintiff "has the right to immediate possession of these payments that is absolute, unconditional, and not dependent upon the performance of any other act," Plaintiff's "right to possession of the payments is being deprived by the unauthorized and wrongful assumption of control or dominion by Defendants," and as a result Plaintiff has been damaged.

Count Six is a claim for an accounting. In addition to all preceding allegations, Plaintiff alleges it has demanded Defendants account for the monies received on Plaintiff's behalf, but Defendants have refused to do so. Plaintiff alleges "an accounting is required in order for Plaintiff to determine what actions and damages it is entitled to against Defendants." Plaintiff alleges it "may be deprived of the ability to redress the wrongs" of Defendants without an accounting. Thus, Plaintiff concludes, it does not have an adequate remedy at law, absent an accounting.

Count Seven is a claim for a violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964.

In addition to all preceding allegations, Plaintiff alleges:

Defendants' actions, including their prior actions as set forth in public filings, demonstrate that Defendants devised or intended to devise a scheme to defraud Plaintiff, or obtain Plaintiff's money by means of false or fraudulent pretenses, representations or promises, and they transmitted by wire, in the form of e-mails, writings for the purposes of executing their scheme.

Plaintiff alleges Defendant E-MedRx is an Illinois corporation which did business with Plaintiff, a California company, including collecting and processing payments from locations throughout the United States, including Minnesota, where PBM Prime is located, and as such E-MedRx is engaged in interstate commerce.

Plaintiff alleges Defendant Drennan has derived income from her own and E-MedRx's racketeering activity, has used proceeds from racketeering activity to acquire and maintain control of E-MedRx, and has conducted E-MedRx's affairs through a pattern of racketeering activity.

Plaintiff alleges Defendants' actions "represent a pattern of racketeering activity" as defined by 18 U.S.C. § 1961, in that their actions "throughout the course of their dealings with Plaintiff, as well as their activity with respect to other similarly situated parties in the past," were wire fraud as defined by 18 U.S.C. § 1343.

Plaintiff alleges that as a result of the foregoing it has suffered damages of at least $2.5 million.

Count Eight is a claim for a violation of Illinois' Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 et seq. In addition to all preceding allegations, Plaintiff alleges Defendants engaged in "a pattern of deceptive and fraudulent behavior" with the intent Plaintiff would rely thereon, that said behavior was in the conduct of trade or commerce, and that Plaintiff was damaged as a result of said behavior, all as prohibited by 815 Ill. Comp. Stat. 505/2.

II. ANALYSIS

A.  Motion to Dismiss General Legal Standard

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Sloan v. Am. Brain Tumor Assoc.*, 901 F.3d 891, 894 (7th Cir. 2018).

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Sloan*, 901 F.3d at 894. However, where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012). Although a complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion, and thus, accordingly, threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice. *McReynolds*, 694 F.3d at 885. The plausibility standard calls for a "context-specific" inquiry that requires the court to draw on its judicial experience and common sense. *McReynolds*, 694 F.3d at 885.

B. Defendants' Motion to Dismiss

Defendants argue Plaintiff has tried to turn this mole-hill contract dispute into a mountain of baseless claims. Defendants move to dismiss all but Count One. Plaintiff argues its claims are meritorious and Defendants' motion should be denied.

The parties agree that Illinois substantive law applies to the state law claims brought pursuant to this court's diversity jurisdiction.

1. *Whether Plaintiff has Stated a Breach of Contract Claim in Count Two*

To prove a claim for breach of contract in Illinois, a plaintiff must show the existence of "a valid contract, performance by the plaintiff, breach by the defendant, and damages." *Envision Healthcare, Inc. v. Fed. Deposit Ins. Corp.*, 2014 WL 6819991, at *4 (N.D. Ill. Dec. 3, 2014) (citation omitted).

Defendants argue Plaintiff has pled itself out of court on this claim, because Plaintiff's strongly worded letter of March 8, 2019, terminated the agreement effective April 8, 2019, pursuant to paragraph 4(d) of the Agreement.

Plaintiff responds that Defendants are asking the court to draw inferences against Plaintiff, which the court should not do on a motion to dismiss. Plaintiff argues that even if the letter and pleadings could give rise to Defendants' construction, this is a fact question to be resolved as the litigation progresses. Plaintiff argues that it merely threatened termination, it did not actually terminate the contract. Plaintiff points to paragraphs 51 through 61 of the Amended Complaint, which plead this claim.

As to paragraph 57 of the Amended Complaint, which says "[n]one of the …

provisions for termination [of the Agreement] were met or expressed by either party,"

the court finds that allegation partially contradicted by Plaintiff's March 8, 2019, letter to

E-MedRx. Plaintiff told E-MedRx that Plaintiff thought E-MedRx was in material breach

of the Agreement. Plaintiff went on to say that failure of Defendants to cure as

specifically demanded, by April 7, 2019, "**shall result in immediate termination,**

**effective April 8, 2019**." (#13-1) at 9 (emphasis in original).

However, Plaintiff's expression that it thought E-MedRx was in material breach

pursuant to Section 4(b) is not fatal to Count Two. Notably, after Plaintiff listed its four

demands for cure in the March 8 letter, Plaintiff wrote:

> Please confirm immediately in writing E-MedRx's agreement to undertake
> each of these requirements for cure. In the event these material breaches are
> not cured to the Pharmacy's satisfaction by April 7, 2019, the Pharmacy
> *reserves all rights to take any and all actions* and remedies under the
> Agreement, including but not limited to, termination of the Agreement
> under Section 4(b).

(#13-1 at 10) (emphasis added).

So, while it appears Plaintiff at least attempted to provide notice as required by

4(b), this does not support a finding on a motion to dismiss that Plaintiff did in fact

follow through with termination of the Agreement pursuant to that notice.

Section 4(b) itself is consistent with Plaintiff's overall allegation that the

Agreement was never properly terminated by either party. Section 4(b) says that

the Agreement "may be" terminated by a party if the other party commits a

material breach and that material breach is not cured within a certain amount of time after notice of the breach is given to the breaching party. That leads the court to believe that some further action, after the notice period, could plausibly be required to perfect termination.

Further, Plaintiff's August 12, 2019, letter says Defendants failed to cure as demanded by April 7, 2019, but makes no mention of the Agreement having been terminated, and indeed, it appears from the Amended Complaint that the parties kept on doing business after the April 7, 2019, deadline.

Although Paragraph 57 of the Amended Complaint is contradicted in part by the language of the March 8 letter, that contradiction is immaterial where there is no indication *Defendants* sought to terminate the agreement and where there appears to be no follow up on Plaintiff's threat to terminate the Agreement.

Drawing all reasonable inferences in favor of Plaintiff the court finds Plaintiff has plausibly alleged that the Agreement survived the March 8 letter, and that Defendants breached the Agreement by terminating it without notice.

The court notes the early stage of this case. The parties' conduct and communications between April 8, 2019, and September 2019, will shed much needed light on the specifics of manner in which the parties' relationship ultimately came to an end. Defendants' arguments regarding Count Two may be re-raised at a later stage in the litigation, where the record can be more fully developed "and when the applicable

procedural rules permit a more fulsome and searching analysis." See *Access 4 All, Inc. v. Chi. Grande, Inc.*, 2007 WL 1438167, at *1 (N.D. Ill. May 10, 2007).

Defendants' motion to dismiss Count Two is DENIED.

### 2. *Whether Plaintiff has Alleged Fraud in Counts Three and Eight*

Defendants next argue Plaintiff has failed to allege fraud with particularity as required by Federal Rule of Civil Procedure 9(b). Defendants argue Plaintiff's common law fraud claim, Count Three, and Plaintiff's ICFA claim, Count Eight, fail for this reason. Plaintiff contends it has adequately alleged fraud, with particularity, to plausibly state those claims.

"Under Illinois law, the elements of common law fraud are: '(1) false statement of a material fact; (2) knowledge or belief of falsity by the party making it; (3) intention to induce the other party to act or refrain from acting; (4) action by either party in justifiable reliance on the truth of the statement; and (5) damages to the other party resulting from such reliance.'" *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 776 (N.D. Ill. 2019) (citation omitted).

As to an ICFA claim, the plaintiff must allege that "(1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) such damages were proximately caused by the defendant's deception." *Dubey v. Pub. Storage, Inc.*, 918 N.E.2d 265, 277 (Ill. App. Ct. 2009).

Both a common law fraud claim and an ICFA claim require a plaintiff to plead fraud with particularity. *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996) ("[A] complaint alleging a violation of consumer fraud must be pled with the same particularity and specificity as that required under common law fraud."). Generally, "[p]laintiffs are required to state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (cleaned up); see also *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011) (pleading fraud with particularity generally requires "the 'who, what, when, where, and how' of the fraud.").

While a fraud claim must be alleged with particularity, "courts and litigants often erroneously take an overly rigid view of the formulation," so the Seventh Circuit has "also observed that the requisite information … may vary on the facts of a given case." *Pirelli*, 631 F.3d at 442. Thus, flexibility is required when necessary information lies outside the plaintiff's control. *Id.*

Plaintiff has adequately alleged fraud to satisfy the heightened pleading requirement for both its common law fraud and ICFA claims. Both claims rely on the same conduct, and the only real difference with an ICFA claim is that the alleged "deception occurred in the course of conduct involving trade or commerce." That additional requirement is undisputed here.

20

First as to the statements at issue, Plaintiff alleges the "who, what, when, where, and how" with enough particularity. Plaintiff's allegations detail about twenty statements that purport to be direct quotes from Drennan on behalf of E-MedRx. Those statements are arranged in the Amended Complaint by date and are alleged to have been made directly to Plaintiff's agents. These statements are not alleged upon information and belief, unlike the "third-hand" statements the Seventh Circuit found insufficient in *Pirelli*.

As to the falsity of the statements, Plaintiff alleges that these statements were false. That allegation is entirely plausible because at least some of the statements are plainly inconsistent *with one another*. Further, the statements appear to be inconsistent with what Drennan and E-MedRx actually did, such as saying a payment was sent when the only plausible conclusion from the facts alleged is that no payment was, indeed, sent.

These allegations also plausibly support Drennan's knowledge or belief that her statements were false, largely for the same reasons. Drennan claimed "IT issues" were to blame, then claimed she forgot to input a code, then claimed a "hack." Interspersed were partial payments and partial EOB disclosures. While it is *possible* that this is all a giant misunderstanding caused by a bumbling, victimized, or personally overwhelmed Drennan, it is clearly plausible that Drennan knew or believed her statements to be false.

As to an intention to induce action or inaction by Plaintiff, as alleged the statements were plainly for that purpose. Defendants failed to remit a lot of money to Plaintiff. Plaintiff wanted its money. Defendants said things to "explain" why the money and EOBs were not sent, said it had sent or was going to send the money and EOBs, and followed up with more of the same. Defendants also mixed in the hack of its systems and an FBI investigation, and apparently floated the possibility that the FBI may have to rummage through Plaintiff's systems or shut Plaintiff down. And, Plaintiff alleges, it relied on these statements in deciding not to take immediate action to force collection of the money and immediately move to end the parties' contract. Finally, Plaintiff alleges it was damaged due to reliance on Defendants' statements.

Defendants attack Plaintiff's "use of the phrase 'on information and belief'" in the Amended Complaint.

"The general rule that fraud cannot be pled based on information and belief is not ironclad, however: the practice is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Pirelli*, 631 F.3d at 443.

Plaintiff's allegations "on information and belief" do not relate to the actual statements Defendants are alleged to have made. The only relevant uses of "on information and belief" in the Amended Complaint relate to Plaintiff's belief that Defendants' statements were false or represented a pattern of false statements.

As the court noted above, certain of Defendants' statements are internally inconsistent, which lends credibility to Plaintiff's allegation of falsity. Other statements are inconsistent with Plaintiff's observations, i.e., Plaintiff not receiving a payment for weeks after Defendants said the payment "went out Friday…." And, at this stage, certainly some crucial information is beyond Plaintiff's reach, such as specific information about an FBI investigation related to a "hack" of Defendants, or medical information related to Drennan, Drennan's mother, and Drennan's granddaughter, all of which Drennan invokes at one point or another as she seeks to put Plaintiff off.

Defendants argue that it is implausible that Plaintiff relied, to its detriment, on misrepresentations that were made *after* the alleged fraud occurred. Certainly, Defendants' alleged misrepresentations could have no causal connection to money Defendants are alleged to have taken *before* Defendants made the alleged fraudulent statements. However, Plaintiff alleges it was damaged as a result of Defendants' misstatements because those misstatements induced Plaintiff to continue doing business with Defendants from mid-September 2018, until the parties' contract was terminated, and Defendants kept taking money from Plaintiff during that time. The court finds those alleged damages are sufficiently linked to Defendants' misrepresentations, and do not represent an attempt to bootstrap Plaintiff's earlier losses into losses caused by Defendants' alleged fraud.

Similarly, Defendants assert that "allegations of future conduct do not support a claim for fraud." Defendants note that a "statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities … ordinarily does not constitute an actionable misrepresentation," because otherwise anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed. See *Bowers v. Jones*, 978 F.2d 1002, 1011 (7th Cir. 1992). Defendants do not, however, point out how this principle applies here, instead simply asserting that Plaintiff has come "nowhere close to meeting this requirement."

Plaintiff is not claiming that the entire contract, and all damages it claims to be entitled to in this suit, are a result of Defendants' alleged fraud. There is no indication in the Amended Complaint of a claim for fraud related to the formation of the Agreement. Rather, Plaintiff charges that Defendants' specific statements, made between September 2018 and April 2019, support a fraud theory, because the misrepresentations that started in September 2018 caused Plaintiff damages.

Defendants also argue that the prior litigation against them in this District is irrelevant. Plaintiff mentions two prior cases against Defendants in one paragraph in the Amended Complaint. Plaintiff also attaches the complaints from those prior cases as Exhibit C to the Amended Complaint. See (#13-1) at 65. Defendants argue that prior litigation is irrelevant to this case for a variety of reasons. Plaintiff does not substantively rely on those prior cases, and the court does not find those prior cases

have a material impact on the resolution of this motion. The factual similarities between the allegations in those cases and the allegations in this case are of marginal relevance at this stage. This case is dissimilar from *Pirelli*, for example, where the plaintiff's case was almost entirely premised on allegations borrowed from other similar lawsuits against the same defendant. See *Pirelli*, 631 F.3d at 443.

Here, Plaintiff asserts substantial allegations based on its own experiences with Defendants, and those allegations are the ones that the court is assessing in ruling on Defendants' motion.

The court thus finds that at this early stage of the case, Plaintiff's Amended Complaint states, with particularity, a claim for common law fraud and a claim for a violation of ICFA. Later in the case, the court will be able to take a closer look, once the factual record has been developed. See *Access 4 All*, 2007 WL 1438167, at *1.

Defendants' motion to dismiss Counts Three and Eight is DENIED.

3. *Whether Plaintiff has Alleged Breach of Fiduciary Duty in Count Four*

"A fiduciary is an agent who is required to treat his principal with utmost loyalty and care – treat him, indeed, as if the principal were himself." *Pohl v. Nat'l Benefits Consultants, Inc.*, 956 F.2d 126, 128-29 (7th Cir. 1992) (citation omitted). A claim for breach of fiduciary duty under Illinois law must allege (1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that such breach proximately caused the injury of which the plaintiff complains.  *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 433 (Ill. 2012).

In Illinois, "a power of attorney gives rise to a general fiduciary relationship between the grantor of the power and the grantee as a matter of law." *Lemp v. Hauptmann*, 525 N.E.2d 203, 205 (Ill. App. Ct. 1988) (citing *Apple v. Apple*, 95 N.E.2d 334, 338 (Ill. 1950)); see also *Boyce v. Fernandes*, 77 F.3d 946, 950 (7th Cir. 1996) (power of attorney "creates a fiduciary relation…and thus an opportunity for abuse of the power that is at best tortious and at worst criminal.").

Defendants attack the first element, arguing that the parties were sophisticated business entities who contracted with one another for a principal-agent relationship, so no fiduciary duty arose. Plaintiff counters that Plaintiff executed a limited power of attorney granting E-MedRx certain powers to act in Plaintiff's stead, creating a fiduciary relationship as a matter of law.

Defendants never seriously grapple with the implications of the power of attorney. They emphasize that the power of attorney was limited but fail to cite authority where a limited power of attorney did not create a fiduciary relationship.

Because Plaintiff has alleged that it granted Defendant E-MedRx a power of attorney, allowing E-MedRx to step into Plaintiff's shoes and act on Plaintiff's behalf for certain matters, Plaintiff has alleged the existence of a fiduciary relationship. Further, as Plaintiff has alleged E-MedRx breached that duty causing Plaintiff damages, the court finds Plaintiff has sufficiently alleged a claim for breach of fiduciary duty.

Defendants' motion to dismiss Count Four is DENIED.

4. *Whether Plaintiff has Stated a Claim for Conversion in Count Five*

A conversion claim under Illinois law must allege (1) a right to the property; (2) an absolute unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) the defendant's wrongful and unauthorized assumption of control, dominion, or ownership over the property. See *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008) (citation omitted).

Defendants argue a conversion claim cannot be brought to satisfy a mere obligation to pay money, and further argue that the "economic loss doctrine" bars recovery on Plaintiff's claim for conversion. Plaintiff argues the economic loss doctrine does not apply, and that it has stated a claim for conversion.

First, the court addresses Defendants' argument that a conversion claim cannot lie for a "mere obligation to pay money."

There can be no conversion action "for money represented by a general debt or obligation." *Bill Marek's The Competitive Edge, Inc., v. Mickelson Group, Inc.*, 806 N.E.2d 280, 286 (Ill. App. Ct. 2004) (citing *In re Thebus*, 483 N.E.2d 1258 (Ill. 1985) (law firm's failure to remit withheld taxes to Internal Revenue Service not conversion, but rather a general debt to the government)). However, an action for conversion based solely on money may be sustained where the converted funds are capable of being described, identified, or segregated in a specific manner, so long as the other elements of conversion have been properly alleged. *Id.*

Defendants contend that the allegations in the Amended Complaint only "establish that E-MedRx failed to remit money owed to Plaintiff pursuant to a contract." In support of this argument, Defendants cite *VW Credit, Inc. v. Friedman & Wexler, LLC,* 2010 WL 2330364, at *3 (N.D. Ill. June 7, 2010), in their memorandum, and, in their Reply, cite *Schlessinger v. Chi. Housing Auth.,* 2013 WL 2434704, at *9 (N.D. Ill. June 3, 2013).

In *VW Credit*, the defendant, a collection agency, countersued the plaintiff for, inter alia, conversion, after the parties' contract ended. The plaintiff moved to dismiss the conversion counterclaim, arguing both that the counterclaimant could not bring a conversion claim to satisfy a mere obligation to pay money and also that the counterclaimant had failed to allege that the money at issue belonged to the counterclaimant at all times. The counterclaimant did not oppose the plaintiff's motion to dismiss but argued the dismissal should be without prejudice. The district court dismissed the claim with prejudice, ruling "…we cannot envision…any possible set of facts here that would allow…" a conversion claim. *VW Credit*, 2010 WL 2330364 at *3.

In *Schlessinger*, the plaintiff was a landlord who was unhappy about the Chicago Housing Authority's ("CHA") termination of Housing Assistance Payments ("HAP") to the plaintiff, pursuant to a contract the plaintiff held with CHA. The parties were embroiled in a dispute about whether the plaintiff's rental units were suitable for habitation, and whether CHA's inspection program was appropriate. The payments to the plaintiff were alleged to flow from the federal government to CHA, which was to

28

remit subsidy funds to the plaintiff based on certain of the plaintiff's tenants who had

Housing Choice Vouchers issued by CHA. The plaintiff claimed conversion by CHA,

among a bevy of other claims. The money the plaintiff claimed CHA converted

included ongoing monthly subsidy payments. The district court found the plaintiff did

not "state a claim for conversion because the complaint does not identify specific money

that has allegedly been converted. Nor does [the plaintiff] allege that the specifically-

identifiable money in question belonged to him at all times. Rather, the conversion

claim is nothing more than a restatement of the breach-of-contract claim…."

*Schlessinger*, 2013 WL 2434704, at *9.

Plaintiff cites *Roderick Dev. Inv. Co., Inc. v. Cmty. Bank of Edgewater*, 668 N.E. 2d

1129 (Ill. App. Ct. 1996), to support its position that its conversion claim is proper here.

In *Roderick*, the plaintiff sued a bank and a bank officer to recover funds the bank

refused to distribute to the plaintiff. The plaintiff alleged it was entitled to the funds,

which were defined as five percent of the proceeds of a purchase agreement. The

plaintiff's entitlement to these funds was at the end of a series of transactions involving

a joint venture, a trust, an estate, notes, mortgages, and various assignments of various

rights, subject to other rights, all related to the development and operation of an

apartment building. The defendant argued, inter alia, that an action may not be

maintained for a failure to pay money unless the money was capable of being described

as a specific chattel. As to this argument, the court found:

By contrast, the amount the Bank allegedly converted in this case was not indeterminate but was specific and identifiable. The amount of money the plaintiff alleges the Bank owes is not estimated. Rather it is exactly five percent of the final payment under the purchase agreement. Although the Bank argues that this sum is indeterminate because the plaintiff alleged only a percentage, we do not think it is fatal to the plaintiff's claim at this stage of the proceedings, especially considering the plaintiff's request in its complaint for an accounting to require the defendant to disclose the amount of the final payment.

*Roderick*, 668 N.E.2d at 1136.

The court now turns to the facts of this case.

The court finds *VW Credit* unhelpful. The motion to dismiss in that case was unopposed and rested on two separate bases – the "mere money obligation" issue *and* failure to allege that the money belonged to the counterclaimant at all times. The court did not say which basis it found persuasive or provide any analysis of the issue whatsoever. Indeed, because the motion to dismiss was unopposed in that case, the court did not find it necessary to waste time discussing what the money was supposed to be owed for or any other details.

The court also finds the reasoning in *Schlessinger* unpersuasive. The parties there were embroiled in a multi-faceted dispute over the habitability of the plaintiff's apartments, and how much money was owed to the plaintiff, if any. Further, the plaintiff failed to allege a definable amount of money had been converted, instead alleging additional damages were accruing each month, without a clear endpoint.

The court finds *Roderick* more helpful here. The court in that case explored several decisions on this issue, and determined that even on the complicated facts alleged, after the plaintiff had an opportunity to assess the defendant's books the amount owed would be identifiable. See *Roderick*, 668 N.E.2d at 1133-38.

Here, taking the allegations as true, the money Defendants accepted from third parties belonged to Plaintiff at all times, and Plaintiff has an immediate and unconditional right to it. Each payment Defendants accepted was accompanied by an Explanation of Benefits to make sure each payment could be accounted for. So, the exact amount that Defendants refused to turn over to Plaintiff should be specifically identifiable once discovery is under way.

And, as to the remaining conversion elements, Plaintiff alleges it demanded the money from Defendants, but Defendants refused to give it all the money Defendants received on Plaintiff's behalf.

The court finds Plaintiff has alleged a claim for conversion.

The court must still discuss whether the economic loss doctrine bars this claim, as Defendants argue.

The "economic loss doctrine" prevents recovery for most tort claims when the damages are purely economic. See *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982) (also referred to as "the *Moorman* doctrine"). There are three generally recognized exceptions: (1) where the plaintiff has sustained damages resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are the proximate

result of a defendant's intentional, false representation (fraud); and (3) where the plaintiff's damages are a proximate result of a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions. *In re Ill. Bell Switching Station Litigation*, 641 N.E. 2d 440, 443-44 (Ill. 1994).

District courts in Illinois "are split on whether the *Moorman* doctrine bars recovery for conversion." *Lansing v. Carroll*, 2012 WL 4759241, at *3 (N.D. Ill. Oct. 5, 2012) (comparing cases) (where fraud not alleged, and where conversion claim duplicative of contract claim, conversion claim dismissed pursuant to *Moorman* doctrine).

As discussed above, Plaintiff has adequately alleged fraud and deceptive business practices against Defendants. Thus, the fraud exception appears squarely applicable. The court finds that the *Moorman* doctrine does not bar Plaintiff's conversion claim at this early stage of the case. See *Vanco US, LLC v. Brink's, Inc.*, 2010 WL 5365373, at *6 (N.D. Ill. Dec. 14, 2010) (finding *Moorman* doctrine did not bar conversion claim where alleged loss was based on fraud and deceptive business practices in addition to contract).

Further, the court notes Defendant Drennan was not a party to any contract with Plaintiff and is alleged to have personally converted Plaintiff's money. So, as to Drennan, Plaintiff's conversion claim may be particularly well suited to address Plaintiff's alleged loss.

Given the early stage of this case, and the fact intensive assessment necessary to determine the scope of Plaintiff's conversion claim, and given Plaintiff's well pleaded allegations, Plaintiff's conversion claim survives this stage. See *Access 4 All*, 2007 WL 1438167, at *1.

Defendants' motion to dismiss Count Five is DENIED.

5. *Whether Plaintiff has Alleged A Claim for an Accounting in Count Six*

Under Illinois law,

> To sustain an action for accounting in equity, the complaint must allege the absence of an adequate remedy at law and one of the following: "(1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature." (*People ex rel. Hartigan v. Candy Club* (1986), 149 Ill.App.3d 498, 501, 103 Ill.Dec. 167, 169, 501 N.E.2d 188, 190.) Although equitable remedies are denied when there is an adequate remedy at law, there is an exception for when an accounting action is sought based upon a breach of a fiduciary duty so that a plaintiff may proceed with the action. (*Candy Club*, 149 Ill.App.3d at 501, 103 Ill.Dec. at 169, 501 N.E.2d at 190.) In this case plaintiffs have alleged fraud and a breach of a fiduciary duty, thereby stating a cause of action for accounting in equity.

*Mann v. Kemper Fin. Companies, Inc.*, 618 N.E.2d 317, 327 (Ill. App. Ct. 1992).

Defendants argue in their memorandum that the complaint fails as to fraud and breach of fiduciary duty, and that "the only loss at issue is a loosely defined amount of money owed pursuant to a contract." Thus, Defendants argue, there is no basis for an accounting. Plaintiff counters that it has stated a claim for fraud and breach of fiduciary duty, and otherwise pled it is entitled to an accounting.

The court finds *Mann* is on point here. As discussed above, Plaintiff has alleged

breach of fiduciary duty against E-MedRx, so even if Plaintiff has an adequate remedy

at law, pursuant to *Candy Club*, Plaintiff is still entitled to pursue its claim for an

accounting. Defendants fail to explain why Plaintiff's claim for an accounting should be

dismissed, as to Defendant E-MedRx.

The court will, however, dismiss the accounting claim against Defendant

Drennan in her personal capacity. Drennan was not a party, in her personal capacity, to

the power of attorney. So, Plaintiff's claim for breach of fiduciary duty is not and could

not be alleged against Drennan. While allegations of fraud can be a basis for an

accounting claim when there is no adequate remedy at law, here the court finds Plaintiff

does have an adequate remedy at law (i.e., its fraud and conversion claims) as to

Drennan.

Thus, the court finds Plaintiff's accounting claim is properly alleged against

Defendant E-MedRx. The court further finds the accounting claim must be dismissed as

to Defendant Drennan. Defendants' motion to dismiss Count Six is GRANTED as to

Drennan and DENIED as to E-MedRx.

### 6. *Whether Plaintiff has Alleged a RICO Violation in Count Seven*

"Establishing a RICO violation requires proof by a preponderance of the

evidence of '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

activity.'" *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019) cert. denied, 206

L. Ed. 2d 825 (Apr. 20, 2020) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-97

(1985)). "Congress defined a 'pattern of racketeering activity' to require 'at least two acts of racketeering activity' within a ten-year period." *Menzies*, 943 F.3d at 336 (citing 18 U.S.C § 1961(5)).

"Satisfying the pattern element is no easy feat and its precise requirements have bedeviled courts." *Id.* This court considers itself, too, among the courts so bedeviled. "The Supreme Court has considered the issue at least twice," and Seventh Circuit case law shows many efforts to articulate what a plaintiff must plead to establish a pattern of racketeering activity. *Menzies*, 943 F.3d at 337. "Over these many cases the law has landed on a pleading and proof requirement designed 'to forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law.'" *Menzies*, 943 F.3d at 337 (citing *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992)). The Seventh Circuit has explained:

> To plead a pattern of racketeering activity, "a plaintiff must demonstrate a relationship between the predicate acts as well as a threat of continuing activity"—a standard known as the "continuity plus relationship" test. *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011). The Supreme Court announced this test in *H.J., Inc.* and made plain that the relationship prong is satisfied by acts of criminal conduct close in time and character, undertaken for similar purposes, or involving the same or similar victims, participants, or means of commission. See 492 U.S. at 240, 109 S. Ct. 2893. The relatedness of the predicate acts often does not yield much disagreement, and much more often the focus is on the continuity prong of the test. See *Vicom*, 20 F.3d at 780.
>
> Just so here: the battleground in this appeal is whether Menzies adequately pleaded the continuity dimension of the continuity-plus-relationship test. Doing so requires "(1) demonstrating a closed-ended series of conduct that

existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future." *Roger Whitmore's Auto Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 673 (7th Cir. 2005).

Do not let the labels create confusion. The big picture question is whether Menzies adequately alleged that the challenged conduct occurred and went on long enough and with enough of a relationship with itself to constitute a pattern. Answering that question is aided by focusing on two, more particular, inquiries. One of those inquiries—designed to ascertain the presence of a so-called "closed-ended" series of misconduct—asks whether there were enough predicate acts over a finite time to support a conclusion that the criminal behavior would continue. See *Vicom*, 20 F.3d at 779–80. The focus, therefore, is on "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Id.* at 780 (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986)).

The alternative continuity inquiry—applicable to an "open-ended" series of misconduct—focuses not on what acts occurred in the past but on whether a concrete threat remains for the conduct to continue moving forward. See *id.* at 782. This can be done by showing that a defendant's actions pose a specific threat of repetition; that the predicate acts form part of the defendant's ongoing and regular way of doing business; or that the defendant operates a long-term association for criminal purposes. See *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016). On these fronts, it is not enough to base an open-ended continuity theory on just one prior predicate act and an otherwise unsupported assertion that criminal activity will continue into the future. See *Gamboa v. Velez*, 457 F.3d 703, 709 (7th Cir. 2006) (explaining that when "a complaint explicitly presents a distinct and non-recurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity").

Added complexity enters where, as here, a plaintiff seeks to plead RICO's pattern element through predicate acts of mail or wire fraud. When that occurs the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply and require a plaintiff to do more than allege fraud generally. See *Jepson v.*

*Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994) ("Of course, Rule 9(b) applies to allegations of mail and wire fraud and by extension to RICO claims that rest on predicate acts of mail and wire fraud."). Rule 9(b) requires a plaintiff to provide "precision and some measure of substantiation" to each fraud allegation. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). Put more simply, a plaintiff must plead the "who, what, when, where, and how" of the alleged fraud. *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019).

Given these heightened pleading standards and Congress's insistence that a RICO claim entail a clear pattern of racketeering activity, we have cautioned that "we do not look favorably on many instances of mail and wire fraud to form a pattern." *Midwest Grinding*, 976 F.2d at 1024–25 (quoting *Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir. 1990)); see also *Jennings*, 495 F.3d at 475 (explaining that this court "repeatedly reject[s] RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern").

*Menzies*, 943 F.3d at 337–38.

The Seventh Circuit went on to apply this standard to the facts of *Menzies*. In that case, the plaintiff sued a law firm, a lawyer, and two financial services firms regarding a failed tax shelter designed by the defendants. The defendants made multiple fraudulent representations, including by electronic means and phone calls, about the legality and effectiveness of the failed tax shelter. When the tax shelter failed, the plaintiff owed taxes, fees, interest and penalties. The plaintiff sued alleging multiple counts, including a RICO claim. The plaintiff alleged the defendants had made similar misrepresentations to another party (a business partner of the plaintiff). The plaintiff also made general allegations that the defendants had marketed a similar tax shelter to investors in Arizona and North Carolina.

Under the "closed-ended" theory of alleging a pattern of racketeering, the court found the plaintiff's complaint insufficient. The court acknowledged that the plaintiff had alleged with particularity multiple instances of mail and wire fraud against the plaintiff and against one other potential "customer" – the plaintiff's business partner. The court went on to find that the plaintiff had not alleged with particularity fraud against the Arizona and North Carolina investors. So, the plaintiff was left with only the allegations of mail and wire fraud – repeated as they were – against the plaintiff and the plaintiff's business partner. The Seventh Circuit held,

> That falls short of pleading a pattern of racketeering under the closed-ended approach to the continuity-plus-relationship test that the Supreme Court announced in *H.J., Inc.* We need to look at the number and variety of predicate acts, the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *Vicom*, 20 F.3d at 780; see also *Roger Whitmore's Auto Servs.*, 424 F.3d at 673 (explaining that, in this analysis, "[n]o one factor is dispositive"). In doing so, we keep foremost in mind a "natural and commonsense approach to RICO's pattern element," which requires enforcing "a more stringent requirement than proof simply of two predicates, but also envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amount to, or threatened the likelihood of, continued criminal activity." *H.J., Inc.*, 492 U.S. at 237, 109 S. Ct. 2893.

> But here we only have two individuals (Menzies and Ferenc)—two business partners and indeed co-founders of AUI—who allegedly fell victim to the same fraudulent scheme (the Euram Oak Strategy) at the same time. While the scheme lasted from 2003 to 2006, the complaint alleges only that Menzies went through with the strategy and suffered adverse tax consequences. The second amended complaint says not a word about whether Ferenc followed through on the strategy or suffered financial harm of any kind. Given Menzies's close business relationship with Ferenc, the absence of particular factual allegations about how and to what degree Ferenc was defrauded is noteworthy.

38

On the whole, though, Menzies alleged enough with respect to Ferenc to establish a predicate act of mail or wire fraud. And with those allegations he advanced, in total, at least two such predicates (against himself and Ferenc). But RICO's pattern element is not just quantitative; it includes qualitative components designed to ascertain the presence of a pattern of racketeering activity. And it is on this precise point—whether Menzies alleged enough, quantitatively and qualitatively, to show a qualifying pattern of racketeering activity—that we determine his pleading was deficient.

*Menzies*, 943 F.3d at 342.

And, under the open-ended theory of a pattern of racketeering, the court held that "only a few lines" of the operative pleading "even hint at any threat of continued fraud" and that even those present "only conclusory assertions to support those allegations." The court went on to reject a theory that the allegations inherently presented a threat of repetition capable of defrauding others, because a "threat of continuity cannot be found from bald assertions." *Id.* at 342-43.

This court now turns to Plaintiff's allegations here. The court finds Plaintiff has failed to allege a pattern of racketeering activity, so its RICO claim must fail.

First, Plaintiff's claims fail under the closed-ended approach. The only predicate criminal activity alleged by Plaintiff is wire fraud, which the Seventh Circuit does not look favorably on in establishing a pattern. And, each instance of alleged wire fraud was directed only at Plaintiff. There is no allegation of fraud or any other predicate criminal offense as to any other victim. While here, as in *Menzies*, several instances of

wire fraud against Plaintiff have been alleged with sufficient particularity, those alone
are not enough where there is only one alleged victim.

Further, the court finds the quality of the predicate acts do not indicate an
inherent likelihood of repetition. For whatever reason, taking the allegations as true and
drawing inferences in Plaintiff's favor, Defendants targeted Plaintiff with their
misrepresentations. But the specific kinds of misrepresentations made to Plaintiff do not
show Defendants engaged in a pattern of fraud in the course of their regular business,
by directing misrepresentations to any other victim. They also do not show Defendants
are likely to defraud others. Indeed, compared to the nearly three-year scheme in
*Menzies*, the approximately one-year long interaction between the parties here is
particularly feeble.

Further, Defendants' fraud as to Plaintiff has, as alleged, in fact, ended, so the
open-ended approach seems ill suited to this case. Plaintiff argues "…the acts of fraud
in question have no termination point—that is, they were meant to perpetuate
Defendants' ability to steal from Plaintiff until the Agreement was finally
terminated…." The court finds this argument unpersuasive. This court "cannot stop
halfway," *Menzies*, 943 F.3d at 344, and fail to consider what happened after
Defendants' alleged fraud. Plaintiff alleges Defendants terminated the contract in
September 2019, ending the parties' relationship, and Plaintiff does not allege
Defendants are currently engaged in predicate acts against Plaintiff or anyone else.

The court's conclusion that Plaintiff has failed to plead a pattern of racketeering activity is not to say that Plaintiff has failed to plead fraud. Plaintiff here has done so, as discussed above. However, "what we are not permitted to do is allow a plaintiff to shoehorn a state-law fraud claim into a civil RICO claim." *Menzies*, 943 F.3d at 342. "It is the statute's pattern element that separates the viable RICO wheat from the common law chaff, and, despite substantial effort, [the plaintiff] has come up short." *Id.* So, too, has Plaintiff come up short on its RICO claim here.

Plaintiff gestures toward the allegations in other lawsuits against Defendants but does not rely on the allegations in those suits to support its RICO claim. This is so, probably, because one suit was settled without establishing the truthfulness of the allegations, and the other was resolved on the merits in Defendants' favor. As noted above in this court's fraud discussion, those cases are of limited value here.

In conclusion, after assessing the quantity and quality of alleged RICO predicate offenses, the court finds Plaintiff has failed to plead a pattern of racketeering activity.[1]

Defendants' motion to dismiss Count Seven is GRANTED without prejudice. Plaintiff is allowed 21 days to attempt to replead a RICO claim consistent with the above standards, if it wishes to do so.

---

[1] The court notes that Defendants raised new arguments against the sufficiency of Plaintiff's RICO claim for the first time in their Reply (#20). The court does not address those arguments because Plaintiff did not have an opportunity to respond to them, and because Plaintiff's failure to allege a pattern of racketeering activity disposes of this claim.

7. *Whether Plaintiff's Remaining Claims Against Drennan Should Be Dismissed*

The common allegations of the Amended Complaint include,

Defendant Drennan's actions and inaction on behalf of E-MedRx, including but not limited to her assertion of personal problems in an attempt to defer the responsibilities of the corporation demonstrate such unity of interest and ownership in E-MedRx that the separate personalities of the corporation and Drennan no longer exist, and that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice upon Plaintiff.

Plaintiff's claims for fraud, conversion, an accounting, RICO, and an ICFA violation seek damages against E-MedRx and Drennan in her personal capacity. The other counts, breach of contract and breach of fiduciary duty, seek damages against only E-MedRx.

Plaintiff's prayer for relief, however, asks the court to pierce the corporate veil and find Defendant Drennan personally liable for all damages.

Defendants move for dismissal of all claims alleged against Defendant Drennan in her personal capacity. Plaintiff responds that to the extent a corporate officer is alleged to have directly participated in a corporate tort, that officer may bear personal liability. Plaintiff also appears to argue that it has alleged enough to seek general corporate veil piercing against Drennan.

The parties agree that "personal liability for actions taken on behalf of the corporation attaches only when the officer or director is alleged to have taken part in the wrongful act initially giving rise to the corporation's liability." *IOS Capital, Inc. v. Phoenix Printing, Inc.*, 808 N.E.2d 606, 611 (Ill. App. Ct. 2004). That level of agreement is

42

enough, given the rest of the court's rulings in this order, for the remaining claims and prayer for relief to survive as pled.

The court has dismissed the accounting claim as it pertains to Drennan personally, and the RICO claim in its entirety. Thus, the remaining claims against Drennan are common law fraud, ICFA, and conversion. Those claims are based on Drennan's fraudulent statements and other actions. So, since Drennan's personal involvement is adequately alleged, those counts are properly brought against Drennan in her personal capacity and will not be dismissed.

The remaining counts are not alleged directly against Drennan, but rather, in its prayer for relief, Plaintiff asks for the additional relief of corporate veil piercing.

Defendants' request to bar corporate veil piercing against Drennan is denied as premature. Drennan is already subject to the full range of discovery, between being E-MedRx's CEO and being personally charged with significant claims of wrongdoing vis a vis Plaintiff. Whether Drennan may also be personally liable for damages that E-MedRx is found liable for is an issue better suited for resolution as the case, and discovery, pull back the curtain on the relevant facts.

Defendants' request that all claims against Drennan in her personal capacity be dismissed is DENIED as to the remaining claims.

8. *Whether the Court Should Strike Certain Forms of Damages*

Defendants argue Plaintiff's prayer for certain forms of damages should be stricken from the Amended Complaint, because contract damages should be compensatory, rather than punitive. Plaintiff asserts these forms of damages are proper for certain claims.

The court notes Plaintiff does not seek any objected-to form of damages on its contract claims, and the court agrees with the parties that punitive damages generally are not available on contract claims. However, such damages are available on certain of Plaintiff's other claims. The fruitfulness of the remaining claims will become clearer as this case develops. If Defendants are ultimately proven liable *on claims for which such damages are available*, and only to the extent of Defendants' liability on such claims, Plaintiff may well be entitled to these forms of damages. And, if Defendants prevail, the theoretical availability of these forms of damages will not matter at all.

Defendants' request to strike certain forms of damages is DENIED.

IT IS THEREFORE ORDERED THAT:

1) Defendants' Motion to Dismiss (#14) is GRANTED with prejudice only as to Defendant Drennan as to Count Six (accounting), GRANTED without prejudice as to Count Seven (RICO) and otherwise DENIED.

2) Plaintiff is allowed 21 days to file an amended pleading. Failure to do so within 21 days shall render dismissal of Plaintiff's RICO claim to be with prejudice.

3)  This matter is referred to the Magistrate Judge for further proceedings

consistent with this order.

ENTERED this 17th day of August, 2020.

<u>s/ Colin Stirling Bruce</u>
COLIN S. BRUCE
U.S. DISTRICT JUDGE